130 P.3d 1054

**Robert LANSDELL and Keiko Lansdell, Plaintiffs–Appellants**

v.

**COUNTY OF KAUAI, State of Hawai'i, Defendants–Appellees**

and

**Bali Hai Villas Limited Partnership, Bali Hai Villas Inc., Richard Vogel, Pamela Vogel, John Does 1–5, John Doe Corporations 1–5, John Doe Partnerships 1–5, Roe Non–Profit Organizations 1–5, and Roe Governmental Agencies 1–5, Defendants.**

No. 26415.

Supreme Court of Hawai'i.

March 30, 2006.

---

James Krueger, Wailuku, on the briefs, for plaintiffs-appellants.

Kenneth S. Robbins and Leighton M. Hara, Honolulu, (Robbins & Associates), on the briefs, for defendant-appellee County of Kauai.

Dorothy Sellers and Kimberly Tsumoto, Deputy Attorneys General, on the briefs, for defendant-appellee State of Hawai'i.

MOON, C.J., LEVINSON, NAKAYAMA, ACOBA, and DUFFY, JJ.

Opinion of the Court by ACOBA, J.

In this consolidated appeal, we hold that (1) Hawai'i Revised Statutes (HRS) chapter 520,[1] the Hawai'i Recreational Use Statute, does not apply to Defendant–Appellee County of Kaua'i (the County), as an adjacent owner of "land," or to lands owned by the government, including lands owned by Defendant–Appellee State of Hawai'i (the State); (2) the County did not have a duty to warn Plaintiff–Appellant Robert Lansdell (Lansdell) of any dangers associated with diving in Queen's Bath, an ocean tide pool (Queen's Bath or tide pool); (3) the County did not voluntarily assume a duty to warn by virtue of its signs pertaining to hazardous ocean and trail conditions; (4) any duty that the County may have had towards Lansdell because of the signs did not give rise to liability to him and Plaintiff–Appellant Keiko Lansdell [collectively, Plaintiffs]; and (5) even if Queen's Bath is deemed a *"de facto"* beach park, no liability on the part of the State and County arose because (a) the dangers found in Queen's Bath are natural conditions, which do not trigger a duty to warn on the part of the State and County defendants, and (b) the provisions of S.L.H. Act 190 (1996)[2] expressly exempt the State and County from liability for failing to warn of dangerous natural conditions. Accordingly, we affirm the January 26, 2004 Judgment entered by the fifth circuit court (the court)[3] dismissing all claims against the defendants.[4]

### I.

Plaintiffs filed a complaint seeking damages arising from a head injury suffered by Lansdell in a diving accident at Queen's Bath located on the north shore of Kaua'i near Princeville. The complaint alleged that Lansdell was rendered a quadriplegic and his injury resulted from the negligence of various defendants in failing to warn the public of the dangers of diving at Queen's Bath. The defendants included Bali Hai Villas Limited Partnership, Bali Hai Villas Inc., the County, the State, Richard Vogel, and Pamela Vogel, all of whom own property associated with Queen's Bath. No counterclaims or cross-claims were filed.

The County filed a Motion for Summary Judgment on February 27, 2003, on the grounds of lack of duty to warn and lack of legal causation between the alleged failure to warn and the injury. On April 16, 2003, the State joined the County's motion. Plaintiffs filed their memorandum in opposition on April 25, 2003, after which the County filed its reply memorandum on April 30, 2003.

On January 26, 2004, judgment was entered in favor of the County and the State and against Plaintiffs on all claims. The judgment dismissed the claims against all the other defendants. On February 24, 2004, Plaintiffs filed a notice of appeal.

### II.

#### A.

Queen's Bath is located on the north shore of Kaua'i at the base of the cliffs adjacent to the Princeville neighborhood. It is a natural pool of water carved into a lava shelf with inlets allowing for the ebb and flow of the ocean. The bottom of the tide pool varies and some parts are replete with rocks while other parts are sandy. The depth of Queen's Bath also varies.

---

1. Relevant provisions of Hawai'i Revised Statutes (HRS) chapter 520 are reproduced *infra.*

2. As discussed more fully *infra,* Act 190 absolves the State of Hawai'i and the separate counties of any duty to warn of dangerous natural conditions in the ocean, on beach accesses, coastal accesses, or in areas that are not public beach parks. 1996 Haw. Sess. L. Act 190, § 2 at 435.

3. The Honorable George M. Masuoka presided.

4. Plaintiffs dismissed Defendants Bali Hai Villas Limited Partnership, Bali Hai Villas Inc., Richard Vogel and Pamela Vogel by stipulation. Plaintiffs never identified any of the potential Doe or Roe defendants. The State and County are the only remaining defendants on appeal.

The State owns the tide pool and the related ocean area. The County owns a 5,669 square foot parking lot on the street level, as well as an easement over a trail leading from the parking lot down to Queen's Bath. The trail is the only apparent means of accessing the Queen's Bath area by foot. It is disputed whether the County maintained the trail or whether it just appeared to be maintained because it was well trodden.

Lansdell was a very good swimmer. As a member of a community swim team, and as a life-saving trainee, Lansdell had been trained to perform "shallow dives". According to Lansdell, shallow dives are dives in which one tries to stay as close to the surface as possible. He was confident in his ability to execute such dives. All of his dives, up to and including the dive in which he was injured, were shallow dives.

Lansdell first visited the Queen's Bath area in 1996. His roommate had read about Queen's Bath in a guide book and decided to explore the area. His roommate visited Queen's Bath with Lansdell's sister Karen, and her then-husband who were visiting Kaua'i. According to Lansdell, the trio "came back very excited." Shortly thereafter, Lansdell accompanied his roommate to the site. Lansdell was very "cautious" during his first visit to the tide pool. The first time he entered the water he jumped into it rather than dived into it.

After gaining confidence he began diving into the tide pool. Lansdell estimated that he had been to the pool approximately three to seven times prior to the day of the accident. During those visits, he dived into the tide pool approximately fifteen to twenty-five times. These shallow dives were performed from either the rock from which he dived when he sustained the subject injury or a more elevated rock on the opposite side of the tide pool.

### B.

On June 29, 1998, the day of the accident, Lansdell took his parents, Mark and Catherine Lansdell, his sister Karen, and Karen's then boyfriend (and now husband), Jamie MacLaren, to the tide pool. After parking their vehicle, the party headed down the access trail to the tide pool. Plaintiffs entered into evidence two photographs of signs that were posted at the top of the trail. One sign cautioned that "hazardous ocean conditions such as high surf, strong currents, sudden drop-offs and sharp/slippery coral can cause dangerous swimming conditions." The other sign warned against hazardous trail conditions. None of the individuals in the party recall seeing any signs posted that day on the parcel or easement owned by the County, or within the Queen's Bath area.

Upon arriving at the tide pool, Lansdell and MacLaren changed into their swimsuits. Lansdell prepared to dive and evaluated the depth of the water. He wanted to find the appropriate place from which to dive. Lansdell intended to find water that was deep enough so that he "wouldn't get hurt". He positioned himself on one of his two familiar dive spots, the lower rock that was about three feet above the surface of the water.

Karen warned him that the water appeared to be shallow, or something to that effect. Although it is unclear whether Lansdell responded to his sister, in his deposition he did acknowledge that the area below the rock had a rocky bottom area. Lansdell stated that his dive had to clear a small shallow area, or "perimeter" of rocks in order to land in the deep sandy area:

Q [COUNTY'S ATTORNEY]. The closest area of sand to where you were diving was an area that you hoped to reach on your dive? You're hesitating.

A. When I took the dive I realized there was a portion of rock that was a shallow portion that needed to be cleared.

Q. Had you cleared the shallow area of rocks would you have hit your head on the bottom?

A. I don't think so. That's why I dove because I felt like where I was diving to and where I was diving from were a safe area.

Q. In other words, you were diving from a rock into what you thought was deep water, *but you knew there was shallow water between where you were diving from and where you were diving to, correct?*

A. *Sure. I knew there was a small perimeter of shallow water.*

(Emphases added.) In response to the question of whether Lansdell "knew there was shallow water between where [he] was diving from and where [he] was diving to," Lansdell stated that the "perimeter" was "less than three feet." He dived head first into the water and was injured when his head struck a rock.

After his dive, the MacLarens saw Lansdell floating in the water and thought he was "kidding", until a child standing nearby noticed that Lansdell was bleeding. Karen and various individuals immediately responded. In a Honolulu–Star Bulletin article dated September 30, 1998, Lansdell is quoted as saying, "There's a rock you can dive off. I've done it many, many times, but this time I guess the tide was too low and I ended up diving into a rock and hitting my head." *Honolulu Star Bulletin*, "Care of accident victim 'like a good recon mission,'" September 30, 1998.

III.

On appeal Plaintiffs argue that (1) summary judgment should not have been granted inasmuch as a mixed question of fact and law existed as to whether the County's duty to warn extended beyond its premises to Queen's Bath; (2) a question of fact and law existed as to whether the County voluntarily assumed a duty to warn when it posted signs at the top of the trail; (3) a fact question existed as to whether Queen's Bath was a "de facto park"; (4) if Queen's Bath was a "de facto park," mixed questions of fact and law existed as to whether the State and County complied with the requirements of Act 190,[5] so as to be shielded by the Act's statutory immunity provisions; (5) a legal question existed of whether a landowner's duty existed independent of a plaintiff's possible negligent conduct so that Lansdell's conduct involved, if at all, only comparative fault; and lastly, (6) a mixed question of fact and law existed as to whether Lansdell's diving into a body of

**5.** Act 190 took effect on July 1, 1996, 1996 Haw. Sess. L. Act 190, § 7 at 437, and remains in effect today (the initial repeal date was June 30, 1999, but that date was extended to June 30, 2002, 1999 Haw. Sess. L. Act 101, § 2 at 370, and then re-extended to June 30, 2007, 2002 Haw. Sess. L. Act 170, § 2 at 610). Act 190 is entitled, "A Bill for an Act relating to Public Land Liability Immunity." Pertinent sections are as follows:

**HRS § 663–Conclusive presumptions relating to duty of public entities to warn of dangers at public beach parks.** a) *The State or county operating a public beach park shall have a duty to warn the public specifically of dangerous shore break or strong current in the ocean adjacent to a public beach park if these conditions are extremely dangerous, typical for a specific beach, and if they pose a risk of serious injury or death.*
. . . .
c) *A sign or signs warning of other extremely dangerous natural conditions in the ocean adjacent to a public beach park shall be conclusively presumed to be legally adequate to warn of the dangerous natural conditions,* if the State or county posts a sign or signs warning of the extremely dangerous natural condition and the design and placement of the sign or signs have been approved by the chairperson of the board of land and natural resources. The chairperson shall consult the task force on beach and water safety prior to issuing an approval of the design and placement of a warning sign or signs pursuant to this section.

d) The State or county operating a public beach park may submit a comprehensive plan for warning of dangerous natural conditions in the ocean adjacent to a public beach park to the chairperson of the board of land and natural resources who shall review the plan for adequacy of the warning as well as the design and placement of the warning signs, devices, or systems. The chairperson shall consult with the task force on beach and water safety prior to issuing an approval of the plan. The task force on beach and water safety may seek public comment on the plan. In the event that the chairperson approves the plan for the particular beach park after consulting with the task force and the State or county posts the warnings provided for in the approved plan, then *the warning signs, devices, or systems shall be conclusively presumed to be legally adequate to warn for all dangerous natural conditions in the ocean adjacent to the public beach park.*

e) *Neither the State nor a county shall have a duty to warn on beach accesses, coastal accesses, or in the areas that are not public beach parks of dangerous natural conditions in the ocean.*

f) *Neither the State nor any county shall have a duty to warn of dangerous natural conditions in the ocean other than as provided in this section.*
1996 Haw. Sess. L. Act 190, § 2 at 435 (emphases added).

shallow water constituted a voluntary encounter of an open and obvious hazard.

In its answering brief, the County maintains that (1) any duty to warn that the County may have had did not extend beyond its ownership of the parking lot or easement trail; (2) HRS chapter 520 precludes its liability; (3) the County did not voluntarily assume a duty to warn of the dangers of diving into shallow water when it posted signs warning of dangerous ocean conditions and hazardous trail conditions; (4) Queen's Bath is not a "de facto" beach park, (5) because Queen's Bath is not a beach park, the obligations set forth in Act 190 are not relevant to this case; (6) there is no duty to warn of open and obvious dangers in Hawai'i; and (7) the absence of a sign warning of the dangers of diving into shallow water was not a legal cause of Lansdell's injuries.

The State agreed with and adopted the entirety of the argument section of the County's brief, except the State also asserted that, as owner and occupier of the ocean, the State only had a duty to warn of dangerous unnatural conditions, and the shallowness of a tide pool is not a dangerous unnatural condition.

Plaintiffs' reply brief argues that HRS chapter 520 is inapplicable to the County as it cannot be deemed "a landowner" within the language of the statute. Plaintiffs request that this court reverse or vacate the entry of judgment and remand the case to the court for further proceedings.

### IV.

■■■ On appeal, the standard of review for the granting of summary judgment is identical to that applicable to the trial court's consideration of the motion. *Cuba v. Fernandez*, 71 Haw. 627, 631, 801 P.2d 1208, 1211 (1990). "Unlike other appellate matters, in reviewing summary judgment decisions an appellate court steps into the shoes of the trial court and applies the same legal standard as the trial court applied." *Beamer v. Nishiki*, 66 Haw. 572, 577, 670 P.2d 1264, 1270 (1983) (citing *Fernandes v. Tenbruggen-*

*cate*, 65 Haw. 226, 228, 649 P.2d 1144, 1147 (1982)). This court reviews a circuit court's grant or denial of summary judgment motion *de novo*. *Hawaii Cmty. Fed. Credit Union v. Keka*, 94 Hawai'i 213, 221, 11 P.3d 1, 9 (2000). The standard for granting a motion for summary judgment is as follows:

[S]ummary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. A fact is material if proof of that fact would have the effect of establishing elements of a cause of action or defense asserted by the parties. The evidence must be viewed in the light most favorable to the non-moving party. In other words, we must view all of the evidence and the inferences drawn from them in the light most favorable to the non-moving party opposing the motion.

*Id.* (internal quotation marks, citations, and brackets omitted).

### V.

■■■ We first address the County's and State's argument that HRS chapter 520 exempts them from liability. As previously mentioned, the County does not own the Queen's Bath area. The only properties owned by the County that "adjoins" the area is an open lot used for parking located at the street level and an easement over a trail leading down to Queen's Bath. According to the County, if it owed a duty of care, such duty was abolished by HRS chapter 520, which limits the duty of care of an owner of land to a person utilizing the property when the owner permits such use for recreational purposes.[6]

In response, Plaintiffs contend that because the County did not own the Queen's Bath area, the County could not be deemed a "landowner" within the language of HRS § 520–2 (Supp.2005). The relevant definitions of HRS § 520–2 are as follows:

---

**6.** HRS § 520–1 (1993) provides that the purpose of the Hawai'i Recreational Use Statute "is to encourage owners of land to make land and water areas available to the public for recreational purposes by limiting their liability toward persons entering thereon for such purposes."

"Charge" means the admission price or fee asked in return for invitation or permission to enter or go upon the land.

. . . .

"*Land*" means land, roads, *water*, watercourses, private ways and buildings, structures, and machinery or equipment when attached to realty, *other than lands owned by the government.*

"*Owner*" *means the possessor of a fee interest, a tenant, lessee, occupant, or person in control of the premises.*

"Recreational purpose" includes but is not limited to any of the following, or any combination thereof: hunting, fishing, swimming, boating, camping, picnicking, hiking, pleasure driving, nature study, water skiing, winter sports, and viewing or enjoying historical, archaeological, scenic, or scientific sites.

"Recreational user" means any person who is on or about the premises that the owner of land either directly or indirectly invites or permits, without charge, entry onto the property for recreational purposes.

(Emphases added.) In addition, HRS § 520–3 (Supp.2005) defines the scope of an owner's duty in the following manner:

Except as specifically recognized by or provided in section 520–6, *an owner of land owes no duty of care to keep the premises safe for entry or use by others for recreational purposes, or to give any warning of a dangerous condition, use, structure, or activity on such premises to persons entering for such purposes,* or to persons entering for a purpose in response to a recreational user who requires assistance, either direct or indirect, including but not limited to rescue, medical care, or other form of assistance.

(Emphasis added.) HRS § 520–6 (1993) also describes the duty of care on the part of persons utilizing property of another for recreational purposes. It states:

**Persons using land.** Nothing in this chapter shall be construed to:

(1) *Create a duty of care or ground of liability for injury to persons or property.*

(2) Relieve any person using the land of another for recreational purposes from any obligation which the person may have in the absence of this chapter to exercise care in the person's use of such land and in the person's activities thereon, or from the legal consequences of failure to employ such care.

(Emphasis added.)

A plain reading of the relevant definitions indicate that HRS chapter 520 is not applicable in this case. *See Franks v. City & County of Honolulu,* 74 Haw. 328, 334, 843 P.2d 668, 671 (1993) (holding that this court's primary obligation in construing a statute "is to ascertain and give effect to the intention of the legislature," which "is to be obtained primarily from the language contained in the statute itself" (quoting *In re Hawaiian Tel. Co.,* 61 Haw. 572, 577, 608 P.2d 383, 387 (1980))); *see also State v. Kalama,* 94 Hawai'i 60, 64, 8 P.3d 1224, 1228 (2000) (explaining that when construing a statute "the fundamental starting point is the language of the statute itself . . . [and] where the statutory language is plain and unambiguous, [the appellate courts'] sole duty is to give effect to its plain and obvious meaning").

The plain language of HRS chapter 520 instructs that protection is afforded only to an owner of land upon which an injury occurs. To reiterate, HRS § 520–6 applies *only* to the "owner" of "land" on the premises of which a person has entered for "recreational purposes." HRS § 520–2 defines "land" as "land, roads, *water,* water courses, private ways, buildings, structures, and machinery or equipment when attached to realty, *other than lands owned by the government.*" (Emphases added.) "Owner" is defined in the same section as "the possessor of a fee interest, a tenant, lessee, occupant, or person in control of the premises."

■ In this case, the County was not a possessor of a fee interest, a tenant, lessee, occupant, or person in control of Queen's Bath, where the injury occurred. Therefore, HRS chapter 520 is not applicable to the County as an adjacent land owner. Insofar as the Intermediate Court of Appeals (ICA)

in *Atahan v. Muramoto*, 91 Hawai'i 345, 984 P.2d 104 (App.), *cert. dismissed*, 91 Hawai'i 345, 984 P.2d 104 (1999), concluded that an owner of a separate lot adjacent to the "land" where the plaintiff's injury actually took place was immunized from liability under HRS chapter 520, we overrule it. HRS chapter 520 does not apply to the State because Lansdell's injury occurred in an ocean area owned by the State. By the plain language of the statute, HRS chapter 520 would not apply to the State, as it does not apply to lands owned by the government.

## VI.

■ With regard to Plaintiffs' argument that the County, as an adjacent owner, may have had a common law duty to warn Lansdell of any dangers associated with diving in Queen's Bath, we hold that such a duty did not attach. Plaintiffs rely on *Geremia v. State*, 58 Haw. 502, 573 P.2d 107 (1977), and *Littleton v. State*, 66 Haw. 55, 656 P.2d 1336 (1982), in contending that the County owed a duty to Lansdell even though his injury did not occur on the County's property.

In *Geremia*, a boy drowned swimming at the "Waipahee Slide" (the Slide), an area prone to sudden flooding after heavy rains. 58 Haw. at 503, 573 P.2d at 109. The Slide was located on private property. *Id.* This court reasoned that because the State did not own the Slide, liability, if any, "must be predicated upon a duty not running to the public at large as would be the case with respect to public parks and other public facilities, but to the individual whom the State has actually misled to his injury." *Id.*

■ This court set out two requirements to establish duty in circumstances where a defendant is a "non-occupier" of land at which an injury occurs. First, the defendant affirmatively took action to induce the plaintiff to engage in the conduct, and second, the defendant created a false appearance of safe-

ty upon which the plaintiff relied on to his or her detriment. *Id.* at 508, 573 P.2d at 112. Hence, Plaintiffs must prove that the County affirmatively took action to induce Lansdell to visit Queen's Bath and, further, that the County created a false appearance of safety regarding diving conditions.

But there is nothing in the record to indicate that the County took affirmative action to induce Lansdell to visit and dive at the Queen's Bath area. The vacant parking lot was conveyed to the County and, by deed, was to be used for a parking lot only. While the existence of the lot could be considered an implied invitation to park there, it is not an affirmative act which can legally be said to have induced Lansdell to visit and dive at Queen's Bath.

To establish duty for a non-occupier such as the County, there must be some affirmative action by the County that induced Lansdell to go to Queen's Bath. According to Lansdell's own testimony, he visited Queen's Bath because his *roommate, sister and her husband* came back excited after they visited it for the first time. The record also indicates that Lansdell had previously dived there on several occasions.

Lansdell also contends that because the Queen's Bath area is mentioned in various guidebooks, including the guidebook that his roommate read, the County affirmatively acted to induce the public to go. However, the guidebooks that Plaintiffs entered into the record were privately published travel books,[7] not brochures or informational pamphlets created by the County.[8]

Secondly, Plaintiffs must prove that the County created a false impression of security. In *Geremia*, this court reasoned that a sign that read, "Waipahee Slide, Danger do not swim when rain is falling in upper streams areas, Stream may flood suddenly," could possibly create a false impression of security on a day in which there was no

---

7. The County argues that the guidebooks entered into the record are not persuasive as they were all published after the date of the accident.

8. In *Geremia v. State*, 58 Haw. 502, 573 P.2d 107 (1977), although the survivors claimed that they learned of the existence of the Waipahee Slide

through a brochure given to them by their hotel, they did not link the brochure to the State. *Id.* at 509–10, 573 P.2d at 112–13. It was concluded by this court that without such a connection the brochures would have no relevance to the plaintiff's theory. *Id.* at 510, 573 P.2d at 113.

rainfall. 58 Haw. at 511, 573 P.2d at 113. Because it did not rain on the day of the incident, the plaintiff could have been under the impression that the Slide was safe to use. *Id.* This court explained that if the plaintiff had relied on the sign and used the Slide believing that there would be no flooding, the second requirement would have been met. *Id.* However, the "thrust of the plaintiff's presentation [in that case] was to negate any knowledge of the sign, and the testimony was to the effect that the boys were racing down the trail and took a short cut before reaching the sign." *Id.* Thus, because the boys had not seen the sign, they could not then claim to have been lulled into a false sense of security by it.

In this case, the signage at the top of the trail on the day of the accident[9] did not pertain to the accident in question as the sign did in *Geremia.* The contents of the signs must have created a false sense of security upon which Lansdell relied.[10] One sign warned against hazardous swimming conditions in the ocean, such as strong currents. The other sign warned against hazardous trail conditions. Neither of these signs would have created a false impression of security regarding the safety of diving into Queen's Bath. And as in *Geremia,* even if the two signs could have created a false impression of security, the fact that the witnesses could not recall seeing any signs would negate any possibility of reliance.

Therefore, the facts, even when considered in a light most favorable to Plaintiffs, would not fulfill the requirements set out in *Geremia.* Accordingly, the County, as a non-occupier or adjacent owner, did not owe a duty to Lansdell to warn him of the dangers of diving in Queen's Bath. Because the County did not owe a duty to Lansdell, it is not necessary to address whether or not the open and obvious doctrine applies to Lansdell.[11]

The *Littleton* case, cited by Plaintiffs, is also distinguishable. In that case, the injury occurred in the shallow area of the ocean fronting a beach park owned by the City & County of Honolulu (the City). 66 Haw. at 56–57, 656 P.2d at 1339. In *Littleton,* this court decided that the City, which owned and operated a beach park fronting the ocean, could be held liable for an injury that occurred in the ocean in front of it. This court stated that whether the City induced the plaintiff to use the beaches adjoining the public beach was a question of fact. *Id.* at 68–69, 656 P.2d at 1345. In this case, Lansdell claims that, like *Littleton,* the County impliedly invited him to visit the Queen's Bath area by owning the parking lot at the top of the trail. However, the County did not own, operate, or maintain a public beach park to which Lansdell could claim he was impliedly invited. Thus, *Littleton* would not apply to this case, inasmuch as the County does not operate a beach park, and only owned a parking lot at the street level and the easement over a trail leading down to the ocean.

## VII.

In their second argument, Plaintiffs contend that a question of fact and law exist-

---

9. It is disputed whether the signs in the photographs were posted during the time of the accident. The photographs were taken sometime after the accident.

10. One sign stated, "CAUTION—Hazardous ocean conditions such as high surf, strong currents, sudden drop-offs and sharp/slippery coral can cause dangerous swimming conditions. Use caution and common sense. Carelessness has cost lives." The other sign read, "CAUTION—Hazardous trail conditions such as loose footing and rocks, steep inclines and ledges can cause dangerous hiking conditions. Use caution and common sense."

11. The County and State raised the issue of whether the open and obvious doctrine applied to Lansdell when he dove head first into the water knowing he needed to clear a shallow "perimeter" of rock before landing in the deep part of the tide pool. They cite to *Friedrich v. Dep't of Transp.,* 60 Haw. 32, 586 P.2d 1037 (1978), *superseded in part by statute,* as stated in *Bhakta v. County of Maui,* 109 Hawai'i 198, 215, 124 P.3d 943, 960 (2005), for the proposition that even where the State may have had a duty to warn of possible dangers, said duty can be satisfied by the mere obviousness of the hazard. Regarding the possibility that the State had a duty to warn, this court stated that "[t]he obviousness of a risk substitutes for an express warning and satisfies this obligation." *Id.* at 36, 586 P.2d at 1040.

ed as to whether the County voluntarily assumed the duty to warn when it posted signs at the top of the trail. We conclude that the County did not voluntarily assume such duty. According to Plaintiffs, even if the County did not owe a duty to warn Lansdell, the County assumed that duty by posting two signs at the top of the trail.

*Geremia* also addressed an assumption of duty issue. In *Geremia*, it was determined that the State did not have a duty to erect a warning sign at the Slide because it was located on private property. 58 Haw. at 509, 573 P.2d at 112. However, because the State voluntarily erected the sign, this court concluded that the "State's liability could be assessed under a principle analogous to the general principle of liability which requires an actor to exercise reasonable care when conferring a gratuitous benefit." *Id. See also* Restatement (Second) of Torts § 323 (1965) which states:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Judge Cardozo, as quoted by this court in *Geremia*, succinctly said, "[i]t is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully if at all." *Geremia*, 58 Haw. at 507, 573 P.2d at 111 (quoting *Glanzer v. Shepard*, 233 N.Y. 236, 135 N.E. 275, 276 (1922)). Again, in *Geremia*, this court examined (1) whether the defendant affirmatively took action to induce the plaintiff to engage in the conduct, and (2) whether the defendant created a false appearance of safety upon which the plaintiff relied to his or her detriment. As stated above, in this case, Plaintiffs did not meet the *Geremia* requirements, thus an assumption of duty is not established.

We agree with the County that the Plaintiffs rely on cases that are distinguishable. In the first case cited by Plaintiffs, *Kaczmarczyk v. City & County of Honolulu*, 65 Haw. 612, 656 P.2d 89 (1982), *superseded in part by statute*, as stated in *Bhakta v. County of Maui*, 109 Hawai'i 198, 215, 124 P.3d 943, 960 (2005), the plaintiff and a friend were visiting from the mainland. *Id.* at 613, 656 P.2d at 91. They went swimming at Ehukai Beach Park in Oahu. *Id.* The two became caught in a current which ultimately swept them out to sea. *Id.* The friend managed to make it back to shore; however, the plaintiff disappeared into the ocean. *Id.* One of the issues on appeal was whether the City assumed a duty to patrons of the beach park by voluntarily providing life guards. *Id.* at 616–17, 656 P.2d at 92–93.

This court stated that, "even where a municipality is under no duty to provide life guard services, . . . if it voluntarily assumes the protective responsibility it has a duty to perform those services with reasonable care." *Id.* at 617, 656 P.2d at 93. *Kaczmarczyk* is distinguishable inasmuch as that case concerned factually dissimilar circumstances. As the County states, "the negligence in that case concerned the degree and quality of training received by the lifeguards, and their subsequent performance." But a duty is assumed by the County only if the *Geremia* factors are present, which, as earlier stated, they are not.

In *Collard v. United States*, 691 F.Supp. 256 (D.Haw.1988), a boy died while playing on a log in the water near a beach at the Marine Corp Air Station. *Id.* at 257. Lifeguards stationed on the beach had put up red flags earlier in the day indicating swimming and surfing were prohibited due to rough water and debris in the water, including the log. *Id.* Later, after the log was apparently pushed over the reef, the lifeguards posted yellow flags, indicating that persons must swim at their own risk. *Id.* The yellow flags were posted at the time of the accident. *Id.* The district court assumed that HRS chapter 520 could apply to the federal government and determined that the government likely had no duty to warn. *Id.* at 260. However, by voluntarily manning lifeguards, and post-

ing the different warning flags, the district court concluded that the federal government assumed a duty to do so with reasonable care. *Id.*

Because the lifeguards had seen the log and were aware that it was somewhere in the water, the district court ruled that whether the lifeguards acted with reasonable care was appropriate for the jury to decide. *Id.* Again, the facts of *Collard* are not analogous to this case. The federal district court decided that there was a genuine issue of material fact regarding whether the boys were induced into the water and relied on a sense of security provided by the presence of lifeguards and the changing of the red flags to yellow flags. Based on the record, no such issue exists here.

Lastly, *Fink v. Kasler, Corp.*, 3 Haw.App. 270, 649 P.2d 1173 (1982), concerned a stop sign, and the maintenance of such sign. There, the ICA stated that "the State had a duty to properly maintain the sign for the safety of the traveling public who had a right to rely on its continued presence." *Id.* at 272, 649 P.2d at 1173. Again, the facts of this case are quite dissimilar. Any assumption of duty in this case does not involve the maintenance of the signs erected. Under *Fink,* if the County had erected signs at the top of the trail, the only duty that the County assumed was to erect and maintain the signs with reasonable care, that is, in a non-negligent manner. There is nothing in the record to indicate that any signs were negligently erected or maintained. Hence, contrary to Plaintiffs' assertions, the County did not assume a duty to warn so as to give rise to liability for Lansdell's injuries.

### VIII.

Plaintiffs contend that the County was negligent because it did not erect an additional sign specifically warning against diving into Queens Bath. Plaintiffs entered into evidence what they contend is a commonly used sign about the possibility of injury as a result of diving, that they argue should have been posted at Queen's Bath. However, the sign that Plaintiffs submitted states, "DANGER-

OUS SHOREBREAK–Waves break in shallow water, serious injuries could occur, even in small surf. If in doubt, don't go out." The sign does not pertain to the dangers of diving in a shallow area *per se;* it warns against dangerous shorebreaks.

Further, although the County voluntarily warned against strong currents in the ocean and the hazards of the trail, it did not assume the duty of warning against diving in the tide pool. Again, the *Geremia* requirements establishing an assumption of duty were not met. And, as stated above, because Lansdell was not induced by the signs to dive into Queen's Bath, no causal relationship between the presence of such signs and Lansdell's injury existed in any event. As recounted previously, under the facts he could not recall seeing the signs. The signs themselves did not pertain to diving so as to create a false sense of security that diving into Queen's Bath would be safe. Even if the County had a duty towards Lansdell, it would have been to act with reasonable care. Nothing in the record indicates that the County did not act with reasonable care with regard to the signs.

### IX.

In their third argument, Plaintiffs assert summary judgment should not have been granted inasmuch as a question of fact remained on whether Queen's Bath was a "*de facto*" beach park.[12] According to Plaintiffs, "[t]he nature of the Queen's Bath's *scenic attraction* creates a question of fact [of] whether it is a *de facto* beach park, or something akin thereto, in which case a duty to warn *may* exist." (Emphases added and in original.) Plaintiffs state that "[t]he scenic nature of the area created the 'implied invitation' relevant to the need for a warning where the [County's] easement access led to it." As mentioned, Plaintiffs argue in their fourth argument that if Queen's Bath was a "*de facto*" park, mixed questions of fact and law existed as to whether the State and County complied with the requirements of Act 190, so as to be shielded by the Act's statutory immunity provisions.

12. Plaintiffs do not contend that the Queen's Bath is a public beach park.

### A.

The concept of a *"de facto"* beach park is mentioned in the ICA's decision in *Kamakawiwoole v. State of Hawaii*, 6 Haw.App. 235, 718 P.2d 1105 (1986), which Plaintiffs rely on to support their contention that a duty to warn existed. Although the ICA did not expressly define what a *"de facto"* beach park was, the property involved in that case was an undemarcated United States Army property surrounded by the State's property, wherein three landing ramps were located. *Id.* at 235–36, 718 P.2d at 1106. For an undisclosed number of years, the area had been used by the public for picnicking, snorkeling, fishing, swimming and camping. *Id.* at 236, 718 P.2d at 1106. The plaintiff in *Kamakawiwoole* was injured after slipping on a ramp while attempting to prevent her son from falling into the water. *Id.* The plaintiff sued the State and the trial court awarded summary judgment against the plaintiff and in favor of the State. *Id.* at 236, 718 P.2d at 1106–07.

On appeal, the ICA cited to the common law rule that "an occupier of land fronting the beach and ocean who induces or invites a business or public invitee onto its land to engage in an action on the adjoining public beach or ocean may owe a duty to warn that invitee of the dangers involved in engaging in the action." *Id.* at 237, 718 P.2d at 1107 (citing *Tarshis v. Lahaina Inv. Corp.*, 480 F.2d 1019 (9th Cir.1973) (holding defendant hotel liable for plaintiff's injuries after concluding that defendant impliedly invited plaintiff by operating a hotel fronting a public beach and ocean); *Kaczmarczyk*, 65 Haw. at 616–17, 656 P.2d at 92–93 (concluding that plaintiff's decedent's injuries resulted after city's implied invitation to swim in the public ocean by operating a public park); *Littleton*, 66 Haw. at 69, 656 P.2d at 1345 (observing that defendant impliedly invited plaintiff to walk on the public beach where accident occurred)).

The ICA in *Kamakawiwoole* first noted that the plaintiff in that case was the State's public invitee and the accident occurred in an undemarcated area surrounded by the State's property. *Id.* at 239–40, 718 P.2d at 1109. The ICA then vacated the trial court's grant of summary judgment after determining that a question remained as to "whether, by operating a *de facto* public park partially fronting the public beach and ocean and surrounding the Army's de facto public park fronting the public beach and ocean, the State impliedly invited [the plaintiff in that case] and her infant son to use the Army's park where the accident occurred." *Id.* at 240, 718 P.2d at 1109.

### B.

However, Plaintiffs' reliance on *Kamakawiwoole* is foreclosed by this court's ruling in *Birmingham v. Fodor's Travel Publ'ns, Inc.*, 73 Haw. 359, 833 P.2d 70 (1992), the passage of Act 190 in 1996, and our recent decision in *Bhakta*, and, therefore, we are not convinced by Plaintiffs' argument that a duty to warn exists in this case.

In *Birmingham*, the plaintiff, Joseph Birmingham (Birmingham), was injured while body surfing in the ocean. 73 Haw. at 363, 833 P.2d at 73. Birmingham sued the State, Fodor's Travel Publications, Inc. (Fodor's), and the County of Kaua'i. *Id.* at 364, 833 P.2d at 73. The County owned Kekaha beach park fronting the ocean where the surfing accident occurred. The trial court granted summary judgment in favor of the three defendants. *Id.* at 365, 833 P.2d at 73–74. On appeal, this court affirmed summary judgment with regard to Fodor's and the State, and vacated summary judgment against the County.

With regard to the State, this court affirmed the *Littleton* rule that "[t]he State, as owner and occupier of the ocean water ..., does not owe a duty to persons injured as a result of water-related activities, unless the 'facts are similar to [*Asato v. Matsuda*, 55 Haw. 334, 519 P.2d 1240 (1974) ], or analogous thereto.'" *Id.* at 378, 833 P.2d at 80 (quoting *Littleton*, 66 Haw. at 63 n. 2, 656 P.2d at 1342 n. 2). The *Asato* factors are "(1) whether the condition causing the injury was a dangerous *unnatural* condition in the area of water related activity; and (2) whether the State had actual or constructive knowledge of the condition." *Id.* (emphasis added). If a court determines that both

factors are present, then the "State has a duty to warn of the condition by taking whatever measures, if any, are reasonably available to rectify and prevent the condition." *Id.*

In *Birmingham*, this court held that the wave, which injured Birmingham, was a "naturally occurring phenomenon of the ocean—not a man made object such as the floating poles, logs and pilings at issue in *Littleton.*" *Id.* It was concluded that the State had no duty to warn of the wave because it was not a dangerous unnatural condition, and, thus, the first prong of the *Littleton* test was not met. *Id.* at 379, 656 P.2d 1336, 833 P.2d at 80.

This case is analogous to *Birmingham.* Lansdell was injured in the tide pool. The State owned the Queen's Bath area as owner of the ocean and shoreline. The State argues that just as waves in the ocean are "naturally occurring phenomenon," so too are tide pools. *Id.* Plaintiffs do not contend that the tide pool is a "dangerous unnatural condition." *Id.* at 378, 833 P.2d at 80. There is no evidence that the shallowness in a rocky tide pool is a dangerous *unnatural* condition for which the State needed to warn. Therefore, just as in *Birmingham*, the first prong of the *Littleton* test was not satisfied. Furthermore, Plaintiffs have not set forth any evidence that the State had actual or constructive knowledge of the condition.

### C.

Section 2 of Act 190 specifically limits the State's and County's duty to warn. Because Act 190 is in derogation of common law tort principles, it must be strictly construed. *First Ins. Co. of Hawaii v. Lawrence*, 77 Hawai'i 2, 8, 881 P.2d 489, 495, *reconsideration denied*, 77 Hawai'i 373, 884 P.2d 1149 (1994). "Where it does not appear that there was a legislative purpose in the statute to supersede the common law, the common law applies." *Doi v. Hawaiian Ins. & Guar. Co.*, 6 Haw.App. 456, 465, 727 P.2d 884, 890 (1986). Act 190 expressly limits the duty of the State and several counties to warn of dangerous shorebreak or strong cur-

rent in the ocean at public beach parks. Hence, based on the plain language of Act 190,[13] it appears that the legislature intended to restrict the State's and counties' duty to warn of "dangerous shorebreak or strong currents . . . if these conditions are extremely dangerous . . . and if they pose a risk of serious injury or death." 1996 Haw. Sess. L. Act 190, § 2 at 435. Furthermore, the legislature specifically eliminated the State's and various counties' duty to warn on "beach accesses, coastal accesses, or in areas that are not in public beach parks of dangerous natural conditions" and with regard to "dangerous natural conditions in the ocean" other than as provided by Act 190. *Id.* The legislative history of Act 190 also evinces this intention.

> This bill would establish the duty of the State and counties to warn of *dangerous shorebreaks or strong ocean current if the conditions are extremely dangerous, typical for the beach, and if they pose a risk of serious injury or death. . . . The bill does not require warning to be given of other extremely dangerous conditions, but permits the State and counties to obtain the same legal presumption for those conditions if the State or county responsible for the beach posts approved warning signs.*

Sen. Conf. Comm. Rep. No. 98, in 1996 Senate Journal, at 787 (emphasis added).

In *Bhakta*, we discussed the implications of Act 190 with regard to the State's duty to warn. We said:

> Act 190 establishes that the State (1) has a duty to warn of dangerous conditions in the ocean adjacent to a public beach, but (2) has no duty to warn of dangerous natural ocean conditions on beach accesses, coastal accesses, *or in other areas that are not public beach parks.*

109 Hawai'i at 211–12, 124 P.3d at 956–57 (emphasis added). We concluded in that case that the State, as the owner and occupier of the landing and its surrounding ocean water, "did not owe a duty to [the plaintiffs in that case] to warn them of the extremely dangerous ocean conditions" in areas that are

---

**13.** *See supra* note 5.

not "public beach parks." *Id.* at 215, 124 P.3d at 960.

Hence, even if it is assumed that Queen's Bath can be classified as a "de facto" beach park, which we believe it is not,[14] such a classification would not be sufficient to trigger the State's or County's duty to warn under Act 190 inasmuch as a "de facto" beach park is "not [a] public beach park." Moreover, the injury involved in the instant case did not arise from "dangerous shore-breaks or strong ocean current[s that] are extremely dangerous . . . [or that] pose a risk of serious injury or death" as contemplated by the Act.[15] As this court has previously stated, "where the language of a statute is plain, and a literal construction is consistent with the legislative purpose, we are constrained to give effect to the plain meaning of the statute, even if it results in the derogation of a common law rule." *Saranillio v. Silva,* 78 Hawai'i 1, 13, 889 P.2d 685, 697 (1995). Accordingly, we hold that Act 190 is not implicated so as to give rise to liability on the part of the State or the County.

## X.

Inasmuch as Lansdell failed to establish a duty between the State or the County and himself to warn against the dangers of diving into Queen's Bath, we need not consider Plaintiffs' fifth and sixth arguments regarding comparative fault and the open and obvious doctrine.

## XI.

In accordance with the foregoing reasons, we affirm the court's judgment entered on January 26, 2004.

**14.** In addition, other than describing Queen's Bath as a "scenic attraction," Plaintiffs do not state how the State impliedly invited Lansdell to the tide pool area. We do not agree with Plaintiffs' tacit assertion that the fact that an area is a "scenic attraction" creates an implied invitation on the part of the State or any county. Such an implication would charge the State with impliedly inviting the public to every location considered a "scenic attraction." As such, the cases cited in *Kamakawiwoole v. State of Hawaii,* 6 Haw.App. 235, 718 P.2d 1105 (1986), and relied upon by Plaintiffs, are inapposite.

**15.** Plaintiffs do not provide a definition of a "de facto public park." However, they argue that classifying Queen's Bath as such "squares with the definitions of beach and park." (Citing *Merriam–Webster's Dictionary* (11th ed. Nov.2003) (defining "beach" as "a shore of a body of water covered by sand, gravel, or larger rock fragments," or "a seashore area," and defining "park" as "a piece of ground at or near a city or town kept for ornamentation and recreation" or "an area maintained in its natural state as a public property")).